BROOKFIELD TRADE CENTER,
INC., et al., Respondents,

v.

COUNTY OF RAMSEY, Relator.

No. C4–99–1164.

Supreme Court of Minnesota.

April 20, 2000.

Rehearing Denied May 23, 2000.

Susan Gaertner, Ramsey County Attorney, David F. MacMillan, Assistant County Attorney, St. Paul, for relator.

Thomas R. Wilhelmy, Fredrikson & Byron, P.A., Minneapolis, for respondents.

Clayton Robinson, City Attorney, Peter J. McCall, Assistant City Attorney, St. Paul, amici curiae.

David F. Herr, Laura E. Walvoord, Wayne Stuart Moskowitz, Mason Edelman Borman & Brand, LLP, Minneapolis, amici curiae.

## OPINION

BLATZ, Chief Justice.

Relator Ramsey County appeals from a decision of the Minnesota Tax Court granting partial summary judgment to respondents Brookfield Trade Center, Inc., and Petula Associates, Inc. (collectively "Brookfield"), and denying summary judgment to Ramsey County. On remand from this court, the issue before the tax court was whether an assessment agreement establishing the minimum market value for a development property for tax assessment purposes was invalid because the assessor did not comply with the statutory certification requirements set forth in Minn. Stat. § 273.76, subd. 8 (1984).[1] The tax court determined the statute required the assessor to conduct an independent valuation analysis and found that because there was no evidence to show the assessor conducted such an analysis the agreement was invalid. We reverse, concluding that the certification statute requires only an estimate of value based on the assessor's judgment, and that Brookfield failed to rebut the presumption that the assessor complied with the statutory certification requirements.

In July 1985, the City of St. Paul (City), the St. Paul Housing and Redevelopment Authority (HRA), and Oxford Development, Inc. (Oxford)[2] entered into a development agreement for construction of the World Trade Center in downtown St. Paul. The agreement provided that the City would issue tax increment financing (TIF) bonds in the amount of $10 million to help finance the development and that the parties would enter into an assessment agreement. The purpose of an assessment agreement is to establish minimum market values for property tax purposes as provided under Minn.Stat. § 273.76, subd. 8 (1984), for a property under development. Pursuant to Minn.Stat. § 273.76, subd. 8, the property is then valued for property tax purposes each year at the higher of its actual market value or the minimum market value established by the agreement. This ensures tax revenues will be available to repay the TIF bond debt issued for the property regardless of future adverse market conditions.[3]

The following minimum market values were agreed to by Oxford, the City, and the HRA for the World Trade Center: $1,800,000 on January 2, 1986; $10,827,401 on January 2, 1987; and $43,309,606 on January 2, 1988 and thereafter.[4] Under Minn.Stat. § 273.76, subd. 8, the local assessor, in this case the county assessor, was required to certify these values. According to that subdivision, the certification process required that the assessor receive the assessment agreement,

> review the plans and specifications for the improvements to be constructed, review the market value previously assigned to the land upon which the improvements are to be constructed and, so long as the minimum market value contained in the assessment agreement appears, in the judgment of the assessor, to be a reasonable estimate, shall execute the following certification upon such agreement:
>
> > The undersigned assessor, being legally responsible for the assessment

---

1. This section is now codified, as amended, at Minn.Stat. § 469.177, subd. 8 (1998).

2. Brookfield is the direct successor in interest to Oxford.

3. For a more detailed explanation of assessment agreements and their role in TIF plans, see this court's decision in *Brookfield Trade*

*Center, Inc. v. County of Ramsey,* 584 N.W.2d 390, 393–94 (Minn.1998).

4. These values will be referred to as $1.8 million, $10.8 million, and $43 million, respectively.

of the above described property upon completion of the improvements to be constructed thereon, hereby certifies that the market value assigned to such land and improvements upon completion shall not be less than $.........

*Id.*

In the instant case, the assessment agreement between Oxford, the City, and the HRA included two certifications signed by Walter O'Malley, the Ramsey County Assessor in 1985. The first certification incorporated the statutory certification language, stating:

The undersigned, having reviewed the plans and specifications for the improvements to be constructed and the market value previously assigned to the land upon which the improvements are to be constructed, and being of the opinion that the minimum market value contained in the foregoing Agreement appears reasonable, hereby certifies as follows: The undersigned Assessor, being legally responsible for the assessment of the above described property upon completion of the improvements to be constructed thereon, hereby certifies that the market value assigned to such land and improvements upon completion shall not be less than forty-three million three hundred nine thousand Dollars ($43,309,000) until termination of this Agreement.

The second certification explained the certification process that O'Malley subscribed to:

The undersigned, being the duly qualified and acting County Assessor of Ramsey County, Minnesota, hereby certifies that:

1.  he is the assessor responsible for the assessment of the property described in the foregoing Exhibit A;

2.  he has read the foregoing Agreement;

3.  he has received and read a duplicate original of the Development Agreement;

4.  he has received and reviewed the architectural and engineering plans and specifications for the Facilities agreed to be constructed on the property described in Exhibit A by the Developer under the Development Agreement;

5.  he has received and reviewed an estimate of the cost of the property described in Exhibit A and the Facilities to be constructed thereon, prepared by the Developer; and

6.  the Market Value assigned to property and the Facilities described in the foregoing Exhibits A and B upon completion shall not be less than $43,309,000.00.

Both certifications noted the $43 million minimum market value established by the assessment agreement for 1988 and thereafter when construction on the property was expected to be completed, even though minimum market values of $1.8 million and $10.8 million were also established for 1986 and 1987, respectively.

Following the signing of the development and assessment agreements, construction on the World Trade Center began in 1985 and the 37–story office tower and adjacent commercial retail area opened in September 1987. In 1987 and 1988, the property had actual market values of $48,744,200 and $59,167,600, respectively. Pursuant to the assessment agreement and Minn.Stat. § 273.76, subd. 8, Ramsey County assessed the taxes for the World Trade Center based on these actual market values rather than the lower minimum market values. In contrast, from 1989 until the termination of the assessment agreement in 1993, the market value of the World Trade Center was less than or equal to the minimum market value of $43 million set by the assessment agree-

ment. Accordingly, property taxes were assessed on the basis of the $43 million minimum market value.

On January 2, 1993, Ramsey County assessed the 1993 taxes on the property (payable 1994) based on the minimum market value of $43 million. Subsequently, on February 1, 1993, the $10 million bond debt issued by St. Paul for the development of the World Trade Center was retired and the assessment agreement terminated. On May 16, 1994, Brookfield filed a property tax petition in the Minnesota Tax Court seeking a reduction in the 1993 assessed value to reflect the actual market value of the World Trade Center.

During discovery, Brookfield deposed the current Ramsey County Assessor, Brian Ducklow, and served him with a subpoena duces tecum requesting all the information contained in the assessor's files relating to the 1985 assessment agreement and the minimum market value for the World Trade Center. Ducklow found only one responsive document. It was a letter dated April 10, 1984, from Gerald Augst, Supervisor of the Commercial–Industrial Section of the Ramsey County Assessor's Office, to Robert Simon, an employee in the Department of Planning and Economic Development for the City of St. Paul. In this 1984 letter, Augst estimated what the property taxes on the World Trade Center might be for the tax years 1985 through 1989. Attached to the letter were three pages of handwritten notes which appeared to be cost, income, and market analysis calculations of estimated market values for those years. The calculations arrived at various market values for the property. Although the last page identified the final estimates as $21.5 million and $30.2 million for 1987 and 1989, respectively, the handwritten calculations also reflected several other market values, including the values of $42.4 million, $32 million, and $35 million.[5]

In response to Brookfield's discovery requests, a second document related to the minimum market value was produced from the files of the City of St. Paul. It was a memorandum dated May 17, 1985, from Greg Blees of the Office of the Mayor to members of his staff (Blees Memo). This memo referred to an attached worksheet that calculated what the minimum market value for the World Trade Center property needed to be to support the issuance of TIF bonds. The memo explained that "[t]his worksheet should be the basis for determining the Minimum Assessor's Estimated Market Value for determining Oxford's minimum property tax after the World Trade Center is constructed, regardless of occupancy." The memo suggested that the minimum market value must be $43,307,645 to support the bond debt, and arrived at that value by back-calculating from the proposed bond amount. It concluded by stating that "[t]his calculation results in a minimum value equal to an assessed value under the income approach if the building was 58% occupied." Although the Blees Memo was produced by the City, the parties agreed that there was no evidence that former Ramsey County Assessor O'Malley saw it. O'Malley was never deposed because after his retirement in 1986, he moved to another state, and the parties were unable to locate him.

The parties brought cross-motions for summary judgment in the tax court. Brookfield argued that: (1) the language of the assessment agreement provided that the minimum market value had no further force or effect after the termination date of February 1, 1993, and so the 1993 taxes (payable 1994) should be assessed on the actual market value of the property; or (2) the agreement was unenforceable because the assessor's certification did not comply with the statutory requirements of Minn. Stat. § 273.76, subd. 8. The tax court

---

5. No tax years are specified for the calculations of these other market values.

agreed with Brookfield on the first ground, concluding that the termination of the assessment agreement on February 1, 1993, meant that the 1993 taxes (payable 1994) had to be assessed on the property's actual market value. Accordingly, the tax court granted Brookfield's motion for partial summary judgment as to that issue without addressing the statutory certification requirements argument, and set the matter of valuation for trial. *See Brookfield Trade Ctr. v. County of Ramsey*, No. C1–94–5200, 1997 WL 606726, at *1 (Minn. Tax Ct. Sept. 29, 1997). Ramsey County appealed from this decision, and we reversed, holding that termination of the agreement on February 1 did not mean that the January 2 tax assessment could be changed retroactively. *See Brookfield Trade Ctr. v. County of Ramsey*, 584 N.W.2d 390, 394–95 (Minn.1998) (hereinafter *Brookfield I* ). We then remanded the matter to the tax court for a determination whether the assessor's certification complied with the requirements of Minn.Stat. § 273.76, subd. 8. *See Brookfield I, 584* N.W.2d at 395.

Subsequent to our decision in *Brookfield I,* the parties again brought cross-motions for summary judgment, this time on the statutory certification issue. Ramsey County argued that it was entitled to summary judgment because the county assessor must be presumed to have complied with the statutory certification requirements, and there was no evidence to overcome that presumption. Brookfield moved for partial summary judgment on the ground that even if the county assessor is

entitled to a presumption of compliance with the law, the evidence was sufficient to overcome that presumption and require Ramsey County to affirmatively prove the assessor properly certified the minimum market value by first conducting an independent valuation analysis.

■■ The tax court again granted partial summary judgment to Brookfield and denied Ramsey County's cross-motion. *See Brookfield Trade Ctr. v. County of Ramsey,* No. C1–94–5200, 1999 WL 305223, at *4 (Minn. Tax Ct. May 11, 1999) (hereinafter *Brookfield* (Tax 1999)). The tax court concluded that Minn.Stat. § 273.76, subd. 8, required the assessor to make an independent valuation that the minimum market value was a reasonable estimate of the value of the property. *See Brookfield* (Tax 1999), No. C1–94–5200, at *3. Although the tax court recognized the principle that public officials are presumed to have properly performed their duties and complied with statutory procedures, it decided that the evidence submitted by Brookfield rebutted this presumption, shifting the burden of proof to Ramsey County. *See id.* Because Ramsey County failed to produce evidence showing the assessor conducted an independent valuation analysis, the tax court concluded that the assessment agreement was invalid. *See id.* at *3–4. The tax court left the matter of the valuation of the property for trial. *See id.* Relator Ramsey County appeals from this decision.[6]

## I.

■■ On appeal from summary judgment, we must determine "whether there

6. Although the tax court labeled its decision a "final order," this partial summary judgment did not fully dispose of the litigation because the issue of valuation remained for trial. *Cf. Liberty Mut. Ins. Co. v. Wetzel,* 424 U.S. 737, 742–43, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (stating that although the district court made the "recital required" under Fed.R.Civ.P. 54(b) that "final judgment be entered," the order was not appealable because it granted partial summary judgment on the issue of liability but left the issue of damages for trial). Partial summary judgments are interlocutory

in nature, and as such are not final judgments. *See id.* at 744, 96 S.Ct. 1202, 47 L.Ed.2d 435; *Erickson v. General United Life Ins. Co.,* 256 N.W.2d 255, 259 (Minn.1977). An appeal from partial summary judgment should be included within a single appeal from a final judgment that fully disposes of the litigation. *See Erickson,* 256 N.W.2d at 259. Accordingly, for a second time this case is not properly before this court pursuant to Minn.Stat. § 271.10, subd. 1 (1998) ("a review of any *final order* of the tax court may be had upon certiorari by the supreme court")

are any genuine issues of material fact and whether the lower court erred in its application of the law." *Brookfield I,* 584 N.W.2d at 392–93. This case involves the interpretation of a statute. Conclusions of law, including the interpretation of statutes, are reviewed by this court de novo. *See id.* at 393. This case also involves a determination of whether the evidence submitted by the parties raises an issue of material fact as to whether the assessor complied with the certification requirements of the statute. The determination of whether a genuine issue of material fact exists is also subject to de novo review. *See Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.,* 535 N.W.2d 337, 341 (Minn.1995).

A genuine issue of material fact for trial must be shown by substantial evidence. *See DLH, Inc. v. Russ,* 566 N.W.2d 60, 70 (Minn.1997). The moving party has the burden to show the absence of an issue of material fact, and we must view the evidence in the light most favorable to the nonmoving party. *See W.J.L. v. Bugge,* 573 N.W.2d 677, 680 (Minn.1998). The party resisting summary judgment may not simply rest on its pleadings, but must produce affirmative evidence to show an issue of material fact. *See DLH,* 566 N.W.2d at 71. However, there is no issue of material fact if the nonmoving party "presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the non-

moving party's case to permit reasonable persons to draw different conclusions." *DLH,* 566 N.W.2d at 71.

We begin with a summary of the statutory requirements for certification of an assessment agreement containing a minimum market value. Section 273.76, subd. 8, first requires that the assessment agreement be presented to the assessor, who then reviews the plans and specifications for the proposed improvements to the property and the market value previously assigned to the land. *See* Minn.Stat. § 273.76, subd. 8. Then, "so long as the minimum market value contained in the assessment agreement appears, in the judgment of the assessor, to be a reasonable estimate," the assessor shall certify the minimum market value of the subject property. *Id.*

■ The controversy here centers on what is required of an assessor to make a judgment that the minimum market value is a reasonable estimate. Brookfield claims that the assessor must perform an independent valuation analysis of the subject property to determine if the proposed minimum market value is a reasonable estimate. To make that judgment, Brookfield contends that the assessor must form an opinion as to the market value of the property, utilizing the applicable professional standards. Such an opinion must be supported by a written analysis consisting of the cost, income, and market approaches to valuation. Brookfield also

(emphasis added). *See Brookfield I,* 584 N.W.2d at 393.

It also does not appear that this decision of the tax court satisfies any of the rules that might otherwise permit an appeal from an interlocutory ruling. *See* Minn. R. Civ. P. 54.02 ("When multiple claims for relief or multiple parties are involved in an action, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon express determination that there is no just reason for delay for the entry of judgment."); Minn. R. Civ. App. P. 103.03(h) (providing that an appeal

may be taken from an order denying a motion for summary judgment "if the trial court certifies that the question presented is important and doubtful"); Minn. R. Civ.App. P. 105 (providing for discretionary review of an order not otherwise appealable). Although we again exercise our discretionary authority to adjudicate this appeal in the interests of justice and judicial economy, the tax court and litigants should not assume that future nonfinal orders will be reviewed by this court in the absence of compliance with an appropriate rule authorizing appeal.

suggests that the purpose of requiring the assessor to certify the minimum value is to place the assessor in the role of a watchdog to prevent overzealous city officials and developers from commencing projects that have little financial merit. It is Brookfield's position that to fulfill this role the assessor must "independently opine to the appropriate value." We disagree with Brookfield's contention that the statute requires the assessor to conduct a full market value appraisal to determine that the agreed minimum market value is a reasonable estimate. The tax court also disagreed, recognizing that such an appraisal would be difficult, if not impossible, given that construction on the property has not yet even begun.

In determining that a full market value appraisal is not required, our focus is on the literal requirements of the certification statute. *See* Minn.Stat. § 645.16 (1998) ("When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit."). Section 273.76, subd. 8, requires the assessor to certify, in his or her judgment, that the minimum market value in the agreement "appears * * * [to be] a reasonable estimate." Brookfield focuses on the term "judgment," arguing that it must mean a formal opinion of value. However, we conclude that the word "judgment" as used in this statute simply refers to the expertise and familiarity a county assessor has with market values of major development projects in the jurisdiction. Further, the qualifying words "reasonable estimate" mandate only a rough determination or an approximation of a value. *See Webster's Collegiate Dictionary* 397 (10th ed.1996).

Given that a proposed development is in its gestational stage at the time an assessor certifies the minimum market value, our literal reading of the statutory requirements does not lead to an absurd or unreasonable result. *See Wegener v. Commissioner of Revenue,* 505 N.W.2d 612, 617 (Minn.1993). Importantly, in contrast to what Brookfield suggests, this interpretation does not in any way undermine the responsibility the assessor has to the public fisc, and still necessitates the assessor's reliance on his or her professional expertise and standards to meet the statutory requirements for certification. However, as recognized by the tax court, the assessor need not conduct the substantial inquiry, research, and analysis used to support a contested market value. We hold that the statute simply requires the assessor to determine whether a minimum market value agreed to by the parties and presented to the assessor is a reasonable estimate.

## II.

Having held that the assessor must certify a minimum market value that is a reasonable estimate, our focus turns to whether a genuine issue of material fact exists with respect to whether the assessor complied with the statute. *See Brookfield I,* 584 N.W.2d at 392–93. Specifically, we must determine whether the assessor received the proposed minimum market value, reviewed the plans and specifications for the proposed development, considered the previous market value for the property, and determined that the minimum market value in the agreement was a reasonable estimate. *See* Minn.Stat. § 273.76, subd. 8. The parties have discovered scant evidence of what the assessor did. However, neither party disputes the available evidence or opposes summary judgment on the basis of any disputed material fact issue.

The evidence largely consists of four pieces: (1) the two certifications by the acting assessor attesting that he read the agreement, reviewed the plans, and found the estimated value to be reasonable—one incorporating the statutory language and the second providing additional detail as to his actions; (2) the 1984 Augst letter from

the county assessor's office to a St. Paul employee estimating taxes for 1985 through 1989 and the attached handwritten notes reflecting these calculations; (3) the Blees Memo calculating what the minimum market value of the property needed to be to support the proposed bond debt; and (4) the current assessor's testimony regarding standards for assessors.

■ This evidence is viewed in the context of a presumption that the county assessor, as a government official, properly performed his official duties and complied with statutory procedures when he certified the minimum market value. *See R.E. Short Co. v. City of Minneapolis*, 269 N.W.2d 331, 337 (Minn.1978). Ramsey County relies primarily on this presumption and the assessor's certifications to support its claim that the assessor complied with the statute.

■ The simple probative effect of the certifications should not be underestimated. Generally speaking, courts have found public documents prepared in the regular course of business, like the assessment agreement and the certifications, to be reliable. *See* Minn. R. Evid. 803(8). The assessor signed two documents attesting that he performed each step of the process required by the statute—reviewing the assessment agreement and the plans and specifications for the construction, considering the previous market value of the land and the estimated cost of the property, and certifying that the proposed minimum market value was reasonable. As the parties have been unable to locate the assessor at this time to confirm what the certifications indicate, the certifications themselves are the best available evidence of his having performed the statutory duties.

■ Brookfield claims that the other evidence conclusively shows the assessor

did not perform that duty. First, Brookfield claims the Blees Memo demonstrates that Ramsey County back-calculated the minimum market value from the estimated bond debt to guarantee tax revenues would be sufficient to repay the TIF bonds, rather than estimating the actual market value. However, the Blees Memo was an internal memo circulated among city staff, and there is no evidence that the county assessor saw the memo before certifying the agreed-upon value. Further, even if we view this evidence in the light most favorable to Brookfield by assuming that the assessor saw the memo, there is still no indication that the assessor based his certification on it alone. Therefore, the memo is not probative of whether the county assessor found the agreed value to be a reasonable estimate.[7] Although a court may not weigh evidence on a motion for summary judgment, "the court is not required to ignore its conclusion that a particular piece of evidence may have no probative value * * *." *DLH*, 566 N.W.2d at 70. Given the Blees Memo's lack of probative value, it does not overcome the presumption and create an issue of material fact as to whether the assessor complied with the statute.

■ In addition to its reliance on the Blees Memo, Brookfield argues that the attachment to the Augst letter indicates that when calculating the market value of the property, Augst arrived at various market values demonstrating that the $43 million minimum market value was not a reasonable estimate. There are several problems with this argument. First, the multiple handwritten calculations are not clearly labeled and the assumptions and information used as the basis for the calculations are unknown. For example, the square footage used for the calculations is unclear and may be limited to the office

---

**7.** Indeed, if the Blees Memo has any probative value, it suggests that some sort of valuation was conducted, and that the income method supported the $43 million figure at a certain percentage occupancy.

tower, excluding the adjacent retail area. Further, while there are many numbers that appear to be calculated market values, one of the figures, $42,369,200, closely approximates the $43 million minimum market value certified by the assessor.

In addition to our concerns with the calculations, it is unclear what, if any, relevance the Augst letter, written in April 1984, has to the issue of whether the assessor properly performed his certification duties over a year later, in July 1985. How closely the proposed project as described in the 1984 letter comports with the project as envisioned one year later, yet still not built, is not clear. Such a gap in time reduces even the most favorable viewing of the facts as to Brookfield's claims to a mere metaphysical doubt. This is not enough to demonstrate that a genuine issue of material fact exists so as to preclude summary judgment for Ramsey County. *See DLH*, 566 N.W.2d at 71.

■ Finally, Brookfield points to the testimony of the current Ramsey County Assessor, Ducklow, describing the duties and standards of assessors as support for its position that the former county assessor, O'Malley, did not comply with the statutory requirements when he certified the minimum value in 1985. Specifically, the current assessor testified that it was his opinion that it would constitute a violation of the standards governing appraisers to provide an opinion of value not supported by any analysis under the cost, market, or income approaches. Again, this testimony does little to illuminate whether the previous assessor actually performed the analysis specifically required under Minn.Stat. § 273.76, subd. 8, when he certified the minimum market value in 1985. Brookfield does not dispute that the current assessor was not involved in the 1985 certification and has no personal knowledge regarding the circumstances surrounding that certification. The current assessor's testimony is simply not probative of the narrow factual issue before the court.

In summary, the evidence Brookfield submits is not probative, and at best only raises a metaphysical doubt as to whether the assessor in fact estimated the minimum market value of the property in 1985. As such, Brookfield's evidence does not rebut the presumption that the county assessor complied with the statutory certification requirements. Thus, we conclude that the evidence is insufficient to raise a genuine issue of material fact, and Ramsey County is entitled to judgment as a matter of law.

Reversed.

GILBERT, J., took no part in the consideration or decision of this case.

STRINGER, Justice (concurring).

I agree with the holding of the court and its reasoning and write separately only to express my belief that the fundamental principle of equity is an additional and compelling ground for denying respondents the relief they seek.

Having accepted the $10 million financial assistance package from the City in 1985 in the form of tax increment financing bonds, a subsidy that was hardly reluctantly received by the developers, it comes with ill-grace for respondents to now complain that almost 15 years ago the assessor failed to do his job when certifying the property values as a part of the financing package. Therefore, I would add to the court's rationale for upholding the assessment agreement that by accepting its benefits for almost ten years, respondents, through their predecessor in interest, have waived any defect in the statutory certification process set forth in Minn.Stat. § 273.76, subd. 8 (1984), and are estopped from denying the certification's validity by the passage of time and acceptance of ben-

efits of the agreement. *See Ostraum v. City of Minneapolis*, 236 Minn. 378, 383, 53 N.W.2d 119, 121–22 (1952).

RUSSELL A. ANDERSON, Justice (concurring).

I join in the concurrence of Justice STRINGER.